UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION

21 MD 3010 (PKC)

------------------------------x

New York, N.Y.
June 20, 2024
4:15 p.m.

Before:

HON. P. KEVIN CASTEL,

District Judge

APPEARANCES

BOIES SCHILLER FLEXNER LLP
Attorneys for Plaintiffs
BY: PHILIP KOROLOGOS
IZAAK EARNHARDT

HERMAN JONES LLP
Attorneys for Plaintiffs
BY: SERINA M. VASH

KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC
Attorneys for Plaintiffs
BY: CHRISTOPHER GOODNOW

AHDOOT & WOLFSON PC
Attorneys for Plaintiffs
BY: CHRISTOPHER STINER

FRESHFIELDS BRUCKHAUS DERINGER US LLP
Attorneys for Defendants
BY: JUSTINA SESSIONS
SEAN MURRAY
VERONICA BOSCO

AXINN VELTROP & HARKRIDER LLP
Attorneys for Defendants
BY: CRAIG M. REISER

(Case called)

THE DEPUTY CLERK: For the plaintiff.

MR. KOROLOGOS: Good afternoon, your Honor.

Phil Korologos with Boies Schiller Flexner, for the publisher class.

THE COURT: Good to see you, Mr. Korologos.

MS. VASH: Good afternoon, your Honor.

Serina Vash with Herman Jones, on behalf of Inform Inc.

THE COURT: Good to see you. We missed you at the last conference.

MS. VASH: I missed the Court, Judge.

MR. GOODNOW: Hi there, your Honor. I'm Chris Goodnow with Kellogg Hansen; we represent Daily Mail and Gannett.

THE COURT: Thank you.

MR. STINER: Good afternoon, your Honor.

Chris Stiner of Ahdoot & Wolfson for the advertisers class.

THE COURT: Good to see you.

MS. SESSIONS: Good afternoon, your Honor.

Justina Sessions of Freshfields, for Google.

I'm joined today --

THE COURT: Let me say, it's good to see you. I haven't seen you in a while.

MS. SESSIONS: I have not seen you in a while, your

Honor. It's nice to be here.

My colleagues Sean Murray and Veronica Bosco are joining me today.

THE COURT: All right. Excellent.

MR. REISER: Craig Reiser of Axinn, also for Google.

THE COURT: Anyone else making an appearance?

MR. EARNHARDT: Yes, your Honor.

Izaak Earnhardt, Boies Schiller Flexner, for the publisher class.

THE COURT: Thank you.

All right. We have nine days to the end of fact discovery. I've been trying to keep up with my rulings. When I got the latest round, I thought it was more efficient to do this by having you in today.

Let me begin with the 30(b)(6) depositions. And let me point out some of the considerations.

The Court should consider whether the topics are proportional to the needs of case, not unduly burdensome or duplicative, and described with reasonable particularity. And the reasonable particularity requirement requires the noticing party to describe the relevant subject areas with painstaking specificity. Where the topics are vaguely worded, seek irrelevant information, or are so overly broad as to make it impossible for the responding party to prepare its witness, the Court may strike the topics.

And as Judge Netburn has pointed out, a Rule 30(b)(6) deposition should not be a memory contest of topics better suited to a written response or a supplemental document production. The Court should strike notice topics that would result in a witness merely testifying to information readily available through document production.

So let me start off by hearing from Google.

Google has sought a protective order from this Court. What exactly are you seeking me to do and why?

MS. SESSIONS: Thank you, your Honor.

So we have moved for a protective order on the entire 30(b)(6) notice, your Honor, and would ask that the entire notice be quashed. However, I will note we did make an offer to the plaintiffs to provide some 30(b)(6) testimony in response to certain topics in the offer, and we're willing -- in the notice, and we're willing to stand by that offer.

THE COURT: Let me have you give me something of a chronology. The notice was served in May 10 or so?

MS. SESSIONS: The notice was originally served -- I don't think I have the actual notice -- May 10th? May 10th, yes, your Honor.

THE COURT: Okay.

MS. SESSIONS: And then we had a meet-and-confer.

THE COURT: When was that?

MS. SESSIONS: On May 29th we had a meet-and-confer on

the notice. At that meet-and-confer, we asked the plaintiffs to identify priorities from that very broad notice. Plaintiffs identified 61 out of their 85 topics as supposed priorities. And then also as a part of that meet-and-confer, claimed that certain topics sought testimony on concepts that were not even included in the topics listed in the notice.

We then exchanged written correspondence and, on June 7th, Google made an offer to designate witnesses. We said we would designate witnesses to testify for a total of ten hours to be divided among the plaintiffs as they saw fit, as long as no one witness was going to be compelled to sit for more than seven hours.

And we agreed to designate witnesses on, first of all, various topics relating to Google AdSense, which was one of the products at issue in this case but that had not been the focus of significant deposition testimony previously. So we felt that it would be reasonable to provide 30(b)(6) testimony on the AdSense topic, since the depositions taken so far had not really focused on that topic nor had plaintiffs sort of been able to ask a witness questions on those topics.

We also offered to designate a witness to testify regarding one of the topics specific to Inform, which relates to the transition from the flash video format to the HTML5 video format, which is the unique aspect of Inform's case that does not really relate to the other AdTech antitrust products

and allegations.

And then finally, we said that we would provide two technical product witnesses to answer -- who have previously been deposed multiple times; but we would provide their answers to questions that they had been asked in their depositions that they did not know the answers to. So where there were technical questions that those witnesses were asked, but they didn't know, we would educate them to be able to answer those technical questions.

THE COURT: This is throughout the discovery period; in other words, it's not limited to one subject area?

MS. SESSIONS: This would be -- so these are two witnesses, one of them has been -- is sort of our person most knowledgeable on what we call the sell side products, the ad server or the AdExchange that are accused in this case; and then one witness works on what we call the buy side products, those that work on bidding on behalf of advertisers.

And so we said if you had asked one of -- if you asked one of those witnesses sort of a question within the scope of your 30(b)(6) notice now that they didn't know the answer to sitting in their personal capacity, we would provide you the answers to those questions as a part of this 30(b)(6) response.

THE COURT: So these are two individuals, two specific individuals, each of whom were deposed. And in certain instances, each of them said, Gee, I don't really know the

answer to that question.

MS. SESSIONS: That's correct. There were a few instances in which they were asked sort of in-scope technical questions that they didn't know the answers to as fact witnesses. And so we offered to go get the answers to those questions and provide those.

THE COURT: All right. Go ahead.

MS. SESSIONS: And as I understand it, the plaintiffs rejected this offer. And then they served an amended notice that eliminates certain topics, but still has 38 listed topics that consists of nearly 200 discrete subparts across the notice. And that is the notice on which they moved to compel testimony and for which we are seeking a protective order.

THE COURT: Okay.

All right. Let me leave it at that for the moment and hear from the plaintiffs.

Mr. Korologos, you'll have to forgive me, I have a few questions. You kind of might have imagined that was going to happen.

MR. KOROLOGOS: I did, your Honor.

THE COURT: So I've looked at the 38 topics. This is, I think, the one that was served on June 13th, the amended notice. Thirty-eight topics; 200 discrete areas.

How long would this 30(b)(6) deposition take, in your opinion? And what happens when you get to the ten-hour or

seven-hour limit? What happens then?

MR. KOROLOGOS: Well, your Honor --

THE COURT: Are you going to do them in the order in the notice, and then when the time runs out, go home?

MR. KOROLOGOS: Two points, your Honor.

First of all, the federal rules will, at least in part, determine what the length is. Because the rules, as noted by the committee, said that for a 30(b)(6) deposition, seven hours applies to each designee. They put up one designee, seven hours; two, 14.

What we proposed is 21 hours as a cap for all of these topics. That's it. However many designees. If they put up 21 people, we get, on average, an hour with each. That's what our proposal is. We can do that.

Yes, there are 200 subparts or thereabouts. But if your Honor looks at those, that's because we're giving the detail to allow Google to understand how they need to prepare the witness so that we don't get the answers that say "I don't know."

THE COURT: And then I suppose if time runs out or the witness gives an abbreviated summary answer, then you're going to move to preclude the trial testimony, right?

MR. KOROLOGOS: Well --

THE COURT: Yes.

MR. KOROLOGOS: I don't think if time runs out I get

an opportunity to preclude testimony if I haven't asked the question. If I've asked a question and I get an answer, I don't think they can give a different answer at trial. But I have to ask the question.

THE COURT: Let's take number 14. Concerning the functions you provided to publishers displaying advertisements through AdSense over time, including the margins, take rates, percentage fees, flat fees, or any other charge that you levied for functions performed by AdSense, GDN, AdExchange, DB 360, or the authorized buyer's program, including any functions performed at the Cat 2 Mixer, Super Mixer, and/or Cat 2 Super Mixer in the process of displaying an advertisement through AdSense following topics:

The prices you charge for these functions, the factors you considered in setting those prices for these functions, any analysis you conducted for the purpose of deciding whether to change the prices you charge for any and oral of these functions, or change the pricing structure, including the margins, take rates, percentage fees, flat fees, and/or whether to charge based on cost per clip, cost per mile, and/or cost per action. And the costs you incurred in providing AdSense's services to publishers over time, including any computing costs and any variable, fixed, or semi-fixed operating costs you incurred to display an advertisement through AdSense, the extent to which such costs are associated with operating the

infrastructure of AdSense, GDN, AdEx, or any other Google AdTech product and how much -- how such costs related to the prices you charged.

Now, that is one of the 38 topics; correct?

MR. KOROLOGOS: It is. But that's an easy one.

THE COURT: Okay. We'll get to the hard ones. I wanted to start you off, Mr. Korologos, I wanted to give you a nice softball, you can hit it out of the park. What's the time period?

MR. KOROLOGOS: The time period for that --

THE COURT: You say "over time." Over what time?

MR. KOROLOGOS: Well, your Honor, I think we -- let me first indicate that that's already been agreed to. Topics 12, 13, 14, 15, and 16 are set for a deposition next Friday --

THE COURT: That's great.

MR. KOROLOGOS: -- in London for three and a half hours. And as to the time period, we would go with our relevant time period, your Honor, which is defined in instruction or definition 30, January 1, 2010 to the present.

THE COURT: Okay. Now, this witness is to be prepared by the client; correct?

MR. KOROLOGOS: Yes, by Google. Yes, your Honor.

THE COURT: Or by Google's lawyers. Okay.

And to come to the deposition, they don't have a right to consult notes during a deposition; correct? You could be a

sport and say, I'll let you, but they don't have a right to consult notes in the middle of a deposition.

MR. KOROLOGOS: I'm not sure there's anything that prohibits that, your Honor.

THE COURT: Oh, okay.

So how about in a fact deposition?

MR. KOROLOGOS: Pardon me?

THE COURT: How about in a fact deposition? A 30(b) one deposition?

MR. KOROLOGOS: That would be rare, your Honor.

THE COURT: Rare. Nothing prohibits that?

MR. KOROLOGOS: Well, a witness needs to testify as to their personal knowledge. I can imagine certain exceptions to the standard approach of not consulting things during a pending question. But for 30(b)(6), I've been in many depositions where witnesses have arrived with explanatory materials.

THE COURT: I'll bet. But that's not something that's provided for in the rules. That's a backdoor interrogatory; that's an interrogatory essentially.

All right. What's the next subdivision? Well, okay, let's go for the period, what is it? You start with 2010? 2010 to 2015. This was this as to that, such and so. And now, excuse me a moment, let me look here. From 2015 to 2020, as to this, etc.

This sounds to me exactly what Judge Netburn was

talking about as to a memory test. And as she wrote: A Rule 30(b)(6) deposition should not be a memory contest of topics better suited to written response or a supplemental document production. A court should strike notice topics that would result in a witness merely testifying to information readily available through document production.

Now, you told me I picked an easy one. So tell me what's happening next week.

MR. KOROLOGOS: There's a deposition scheduled. The witness is in London.

THE COURT: One witness?

MR. KOROLOGOS: That's our understanding. For three and a half hours on topics 12, 13, 14, 15, and 16, relating to AdSense. And that's what Ms. Sessions just talked about of the AdSense topics that they were willing to produce a witness on.

And the follow-up, your Honor, with respect to pricing. Given the nature of the way Google runs its business, this is not like going to the supermarket and saying, How much did you charge for oranges back a year ago?

Take, for instance, AdEx --

THE COURT: I get that. That would be easy to testify to. I guess you could learn that and come in and testify.

MR. KOROLOGOS: Take, for instance, AdEx, your Honor. They charge a 20 percent margin constantly. And still they decided to lower it just a little bit for certain transactions

to try to gain more market share. Then what did they do? They then increased it for some transactions to get their average back to 20.

THE COURT: And that's going to be potent evidence at trial, isn't it?

MR. KOROLOGOS: It will be, your Honor.

THE COURT: I'm sure it will. But you don't need a deposition for that.

MR. KOROLOGOS: I believe we're entitled to examine it, particularly, your Honor, for the factors that they considered in pursuing that. We'd like to know why they took that approach and what their arguments are going to be at trial that try to justify that approach.

THE COURT: Ms. Sessions, I'll give you an opportunity a little later. I'm going to continue with Mr. Korologos.

Sorry.

But I don't see a question here that, Hey, I want to take your deposition and ask you the factors that go into setting the rate of margin. If that's what you were seeking from a 30(b)(6) witness, we might not have needed this hearing today. Oh, it may be somewhere included; you could parse through one of your 38 categories and find that embedded in it, but that plus a lot more.

MR. KOROLOGOS: Well, I think it's covered, your Honor, by 14B, the factors you considered in setting those

prices.

THE COURT: But my point is 14B covers from 2010 to the present, a 14-year period. And it doesn't end there, right? That's not all you're asking for. I read 14. That's the one I read. There's a lot more to it. So why not go into a room -- I understand you've already come to an agreement with regard to 12, 13, 14, 15, and I'm not going to upset that agreement. But --

MR. KOROLOGOS: 16 as well, your Honor.

THE COURT: And 16.

Did you take any depositions in which you question witnesses on dynamic allocation and enhanced dynamic allocation?

MR. KOROLOGOS: We have talked with some fact witnesses on those topics, your Honor.

THE COURT: All right.

MR. KOROLOGOS: And on some of those topics, we have asked them questions and received nonanswers. Those are among the topics that Ms. Sessions identified that they were willing to produce witnesses on.

Now, one of the things that I think is telling, your Honor, in the two exhibits we have at the end of our June 14 submission, we have their June 7 letter which says that they -- this is on page 3 of their June 7 letter. They say they will designate a witness or witnesses to testify regarding

previously posed -- questions previously posed to Mr. Korula and Ms. Jayaram in this litigation and for which they did not have an answer on buy and sell-side topics.

Then it goes on and identifies a number of topics that they will produce the witness on, including the operation, the design, expected benefits of dynamic allocation, enhanced dynamic allocation, and several other topics. That's contrary to the position that they say in their motion for a protective order that they can't understand how to produce somebody on that. That's what they've offered to do.

Now, a few days later, they come back and say, Well, what we really mean — and this is the June 12 letter. What they really mean is we're going to produce Jayaram and Korula on ten questions that were not answered at the deposition. But it's very different, your Honor, as your Honor knows, taking a deposition of a fact witness where the witness can truthfully say "I don't know," versus taking the deposition of a corporation through 30(b)(6) where that's not an appropriate answer to a question within the scope.

So when the witness has exhausted their knowledge in a fact deposition, you're going to move on to other topics. That would not happen. And so limiting it to just giving us the answers to those ten questions doesn't get us the deposition that we're entitled to.

THE COURT: Mr. Korologos, what you're saying has a

reasonable component to it. I understand the ways of the world. I understand why there was a notice served with 300 topics -- I'm sorry, 38 topics, 200 discrete categories, if you totalled them all up within the 38 topics. I'm accepting that number at face value. You may have a different number.

Okay. You got the ball rolling and you had discussions. If Google comes back to you and says, Aha, we, Google, found ten answers that the witness said "I don't know," "I don't recall," "I don't understand," and we'll give you that witness for those ten questions, and that was it, and they dug in after that, I would understand the point.

But there is a reason for the meet-and-confer requirement. You may say, legitimately — I suspect you might — No, it's not ten questions that you, Google, picked. I have 30 questions that I can see where the witness claimed "I don't know," "I don't recall." No other witness had testimony to give on the subject, and I now need.

That takes hard work, hard work to sit down and negotiate it.

The alternative is to dump it in my lap and have me do what I have done in this case before: Go through the 38 topics, go through the 200 discrete categories. Have you give it to me in Microsoft Word format; have the defendant do the same. And then I'll issue an order.

But dumping it in my lap is not the way this is

supposed to work.

It seems to me that you have some points that should be traded across the table not next week, but this afternoon — yes, this afternoon. It's probably the longest day of the year; you'll have plenty of daylight to work in — and when the sun rises tomorrow morning. And work it out with Google.

Is Google prepared to sit down and hammer it out? And if the plaintiffs have other areas in addition to the ten which I guess you've self-identified, will you consider producing?

MS. SESSIONS: Yes, your Honor.

So with the understanding that -- what we were trying to do with this offer and with the identification of those ten questions was I recognize there were some things that they couldn't get an answer to out of Mr. Korula and Mr. Jayaram who were, in fact, our 30(b)(6) witnesses in the DOJ case on these topics. So if they identified another specific question of those types that they need an answer to, we would be happy to discuss that with them.

But the "why did you take the approach that you did for reserve price optimization," that and all of those subtopics, they took the depositions of the people that developed reserve price optimization already and they asked those questions. So it seems completely unnecessary to retread all of that in a 30(b)(6) notice.

But to answer your question, your Honor, we're

certainly willing to sit down and discuss an additional set of discrete questions to which they want answers and have been unable to obtain them thus far.

THE COURT: But I think there's a trap door in your answer. There may be more than one trap door, but one that hit me is you're limiting this to a prior 30(b)(6) deponent in the DOJ case.

MS. SESSIONS: Oh, sorry, your Honor, that was not my intention. My point was that Mr. Korula, Mr. Jayaram, who they have already deposed, were also our 30(b)(6) witnesses on the technical topics in the DOJ case. My point being these are not random people who would only be expected to know just a little bit about these technical topics. They are deeply knowledgeable and were, in fact, able to answer most of the questions posed to them. So my point is only that it should be a limited universe of technical questions that remain unanswered at this point.

MR. KOROLOGOS: Your Honor, we're happy to sit down with Google and negotiate further. I would say it is certainly not our intent to dump this in your lap. We started with 81 topics. We then went to 65. We then got down to 38.

THE COURT: You're going in the right direction.

MR. KOROLOGOS: I get that, your Honor. We will narrow it more --

THE COURT: You're not seeking an extension of the

discovery period, are you?

MR. KOROLOGOS: We are not, your Honor.

THE COURT: Okay.

MR. KOROLOGOS: We will narrow it more. We have a regularly scheduled call with Google every Friday at 10 a.m. If we can't get it done between now and 10 a.m., we'll make sure that it's on the schedule for 10 a.m. tomorrow.

THE COURT: That may be a long call.

MR. KOROLOGOS: It may be.

THE COURT: All right. And what I'm going to do is I'm going to have you get for me for Monday your amended 30(b)(6) notice in Microsoft Word format, and the same for Google, and I'll do what I do. And as is typical, you'll both be unhappy.

MR. KOROLOGOS: We will submit ours on Monday, your Honor.

MS. SESSIONS: Understood, your Honor.

THE COURT: All right.

Okay. Now, the depositions were kind of the easy topic.

Before I depart depositions, let me hear from Inform.

As I understand this, Inform is concerned because the document production has not included direct communications between Inform and Google personnel; is that correct, Ms. Vash?

MS. VASH: That's correct, Judge.

THE COURT: All right.

And Google comes back and says -- I don't know whether this is a big lie or the truth, that I think it's prior to 2017, they don't have the documents anymore. Is that what they've said?

MS. VASH: That's what they most recently said, yes.

THE COURT: All right. So what do you do about that? Do we apply torture to get them to confess that they're lying or what do we do?

MS. VASH: We had simply wanted a clear and concise understanding of what their document retention policy was. We asked when they had issued litigation hold letters with respect to our case and our client. We filed this case in November 25, 2019, and wanted to be assured that a litigation hold was placed on the relevant people back at that time so that all of those communications would be preserved.

And Judge, we raised that back then, November/December 2019, with counsel Jonathan Schmidtlein and Eric Schroeder, who were representing Google in the Northern District of Georgia. We just wanted to ensure that, in fact, the litigation hold letters were there and the documents were, in fact, preserved.

The answers we got were less than straightforward. I didn't get -- I tried to get it from the witness that I deposed a few weeks ago. You know, What is your document retention

policy? And I got "I don't understand what you mean by 'document retention policy.'"

THE COURT: All right. Let's see how I do.

MS. VASH: Okay. Thank you, Judge.

THE COURT: Ms. Sessions, those are the questions.

And the answers are?

MS. SESSIONS: Your Honor, certain witnesses that we understood to be potentially relevant to the *Inform* case were placed on a document hold shortly after Inform's complaint was filed in 2019. However --

THE COURT: "Shortly after" means?

MS. SESSIONS: I am not clear on exactly the date that the hold went out.

THE COURT: Six months? Three weeks? One month? Two weeks?

MS. SESSIONS: I am -- it was less than six months, your Honor, but I'm not -- I'm not -- I don't have the dates --

THE COURT: You can provide that easily.

MS. SESSIONS: We certainly could, your Honor.

THE COURT: And that has not been provided to Inform thus far?

MS. SESSIONS: So, your Honor, we have not provided the precise dates on which particular people were placed on hold. Your Honor, our decision to place particular people on hold reflects attorney work product and our assessment of the

case at the time it was filed. However, I can make the representation that certain of the custodians that Inform asked us to search documents for were placed on hold at some point within a reasonable time after the complaint was filed.

However, that was --

THE COURT: Now, I'm ordering you to produce that. Time is short. I'm ordering you to produce the identity of the people as to whom the litigation hold was put in place and when it was put in place.

Now, I think there was a "but" coming or a qualifier coming, and let me have you put that on the record.

MS. SESSIONS: Oh, your Honor, there was no qualifier as to the litigation hold. My point was it is not surprising that for a case that was filed in November of 2019, that there no longer exist emails from many, many years before that because those could have been -- those may have been deleted pursuant to a normal document retention policy because those people were not on hold for the purposes of this case. So it's unsurprising that when we did the document searches for this case, that those didn't come up with emails from 2014 or many, many years before Inform decided to file its case.

We have produced a significant number of documents from those custodians from later dates. But these direct communications that they are talking about simply did not exist in the files that we had.

THE COURT: So you're going to provide your document retention policy dates for documents that fall within the scope of Inform's discovery requests. So I assume their discovery requests don't include leases. And leases or deeds to real estate may have a 40-year hold on them, but they do have categories of business communications. And you're going to provide the length of that retention policy.

MS. SESSIONS: Which we have already provided to Ms. Vash, but we will be happy to provide that again.

I understand this dispute relates only to emails or direct communications, and we've provided that default retention policy to Ms. Vash. And we will be happy to provide the dates on which the Inform custodians were placed on litigation hold.

THE COURT: Okay.

And that's by Tuesday next week. Thank you.

Ms. Vash?

MS. VASH: Thank you, your Honor.

There were many email communications during that time frame. So I don't know if your Honor has ordered the retention policy itself.

THE COURT: No.

MS. VASH: You have not.

THE COURT: I have not.

But it's incumbent on Google to review its policy,

review your document request, and provide you with the length of retention that relates to the requested material. That's why I use the absurd example of a mortgage or a deed or a lease. I assume you haven't asked for any of that. Why would you? And so, therefore, you don't need to know what their retention policy is for that. However, you do need to know what the retention policy is for business communications with a customer, vendor, competitor, or the like, right?

MS. VASH: Exactly. Thank you, your Honor.

THE COURT: Okay. All right. Thank you.

Now, let's talk about requests to admit.

I think I have, is it, 1400 pages or so of exhibits? I just pull Exhibit F, and it doesn't look so bad because it's double-side printed, but it's 274 pages.

Who can honestly say they've tried a case — tried a case — in which they or their adversary offered a response to a request to admit into evidence?

Okay. I'm noticing all the hands that are up so far, it's none. But the point is they are of limited use.

And let me give you the black letter on RFPs -- RFAs, rather. Well, I may not have brought it with me, but from recollection, they are subject to proportionality considerations. They are subject to objections based on burdensomeness and other Rule 26 factors as well. And it looks to me that it might not be humanly possible to respond to the

requests for admission.

Let me ask counsel for Google, how many requests for admissions have been served on you in the MDL cases?

MS. SESSIONS: I think my colleague has the grand total. It's 9,700.

THE COURT: Okay. And that's not just the document ones, or is that just the document ones? Because I thought it was 9700 might have been the document ones, and there were 3,700 nondocument ones. But I'm doing this --

MS. SESSIONS: That's correct. Sorry.

THE COURT: -- by memory, so I could be way off.

MS. SESSIONS: No, you are correct, your Honor.

So the 9,700 is what plaintiffs had called admissibility or document-related ones. And then we have an additional set of fact ones, which is another 450.

THE COURT: All right.

So let's talk about the admissibility ones.

One of the things that is going to go on in this case is there is going to be a joint pretrial order, a joint pretrial order actually for each constituent case in the MDL, each of them is going to need a joint pretrial order. And there can be joint negotiation. But that joint pretrial order is going to have a heavy stipulation of facts. There are a lot of facts that I know the parties can stipulate to. And it will make the trial of this action much easier.

The other circumstance in connection with the joint pretrial order is that everybody will list their trial exhibits, and the parties will indicate whether or not they have an authenticity objection, a substantive objection like hearsay or not a business record. And it seems to me that -- first of all, are the plaintiffs saying they plan to offer 9700 exhibits at trial? Is that the position of the plaintiffs? That's what's going to happen with the jury, they are going to get 97 --

MR. KOROLOGOS: No, your Honor.

THE COURT: Okay. All right.

So what needs to be done with regard to the 9700 is — and I will give you time on this — to determine what you want to use as trial exhibits as the case exists today.

Now, I understand the defendant says they are going to move for summary judgment and it will be -- there will be no documents in the stack or very few. You, on the other hand, with the competence you're entitled to in representing your client, believe that it will be all claims will survive.

But come up with your exhibits for trial. You don't have to do it by June 29th. You're going to come up with a list, and you're going to have an agreed-upon format. You can use the model used for most joint pretrial orders in which it asks whether the other side has an objection and what it's based on: Authenticity, not a business record, hearsay, or

other, please specify. And it's a two-way street. Google will have to do this and submit it to the plaintiffs. And that way you will know what you need.

You will say, These people are objecting on authenticity to documents that were produced out of their own files. And if that's the case, so be it, maybe we're going to go for sanctions, but we now know we need a document custodian witness at trial for that. And you're going to get your document custodian witness. Same way for Google.

Now, I'll give you -- this is a true act of generosity. But I'm going to give you the opportunity to work out a schedule on doing this, at least a proposed one; doesn't mean I'm going to buy it, but to propose one. And to propose a methodology on this. And as I say, it can be after -- it will be after June 29th.

And that takes care, in my view, of 9,700 RFAs.

MR. KOROLOGOS: We'll do that, your Honor.

MS. SESSIONS: Yes, your Honor.

THE COURT: Okay.

Now, you got me down to how many, 400?

MR. KOROLOGOS: 450.

MS. SESSIONS: 450.

THE COURT: 450. Okay.

Now, let me hear Google first, then I'll hear the plaintiffs. What's the matter with the 450?

MS. SESSIONS: Well, again, your Honor, as you noted at the outset, RFAs are subject to Rule 26 limits on burden and proportionality. And 450 requests to admit various facts served at the end of fact discovery with just -- while we're trying to do everything else to get fact discovery closed in this case is grossly disproportionate.

Now, we again proposed to plaintiffs, Why don't you get together. And if there are some things that you don't think you have a straight answer on — again, it's not in our answers, it's not in our interrogatory responses, it's not in the other discovery that you've taken — serve 40 fact RFAs and we'll answer 40 of them. But 450 is not a winnowed list; it's not a list of things that are really important or that they need and it's, frankly, make-work at this stage of the case.

THE COURT: Okay.

Mr. Korologos.

MR. KOROLOGOS: Your Honor, one thing to remember about RFAs is they are only usable in the particular case, and that's one of the reasons why there are 450.

The publisher plaintiffs' list is 203, I believe it is, your Honor, on the fact side. But to limit the four plaintiffs groups to ten RFAs is substantially less than is appropriate to try to move this case along and resolve the facts.

Your Honor asked has anybody submitted an RFA into

evidence. I have not; but have used RFAs a number of times in summary judgment briefing and to develop the stipulated facts that go into the pretrial order and are described to the jury. So that's where I think they are useful and that's why we are trying to narrow them -- narrow the issues that need to be tried.

If your Honor looks at Exhibit I --

THE COURT: By the way, I don't mean to interrupt you, but you are -- everybody in this room is highly experienced. And think back to all the summary judgment motions you've worked on over the course of your career. And think to those 56.1 and 56.2 statements. And, oh, yeah, oh, yeah, you'll get, It's a Delaware corporation. Admitted. Admitted.

What else is admitted in the 300 56.1 statement points?

MR. KOROLOGOS: Not very much, your Honor.

THE COURT: Not very much.

And that's what happens with requests to admit.

Now, what I'm prepared to say is let's go through the groupings of plaintiffs. There is the publishers' class actions.

MR. KOROLOGOS: Yes, your Honor.

THE COURT: There is Gannett and Daily Mail.

MR. KOROLOGOS: Right.

MR. GOODNOW: That's correct, your Honor.

THE COURT: There's Inform.

MS. VASH: Yes, Judge.

THE COURT: There's the advertisers' class action.

MR. STINER: Yes, your Honor.

THE COURT: And what am I omitting?

MR. KOROLOGOS: You've got them all.

THE COURT: Okay.

Now, I have a question for Google.

Mr. Korologos raised a point which I hadn't thought about, but it's a very important point. And I believe him to have said to me — and I think he's right — that a request to admit -- a response to a request to admit is only usable in the action in which it is posed, all right.

Do you agree with that proposition?

MS. SESSIONS: I do agree with that proposition. But I have a potential solution.

THE COURT: That's where I'm headed too. And I think our potential solutions may be similar in appearance.

You will agree that the responses to the request to admit in -- served in the action, these four actions, will be usable in any of the four actions; is that correct? Is that your solution?

MS. SESSIONS: So my solution would -- that is what we contemplated when we proposed the 40, was that the 40 would be usable across the actions.

So I think the answer to your Honor's question is yes, provided that there is a reasonable cap on the number of requests for admission.

THE COURT: Understood. Understood. Understood.

Okay. I'm going to cap them. And I'm capping them collectively at a total of 80. Pick your 80 best ones and go with it.

MR. KOROLOGOS: Thank you, your Honor.

THE COURT: Okay. Now --

MS. SESSIONS: I'm sorry, your Honor, just one point of clarification.

THE COURT: Yes.

MS. SESSIONS: I think they'll pick their 80. And notwithstanding the fact discovery deadline, I assume we would have 30 days to respond after the 80 are served.

THE COURT: No, I'm not extending the fact discovery deadline. I've cut it back. And you're going to have to work.

I will give you -- what I can do for you is I will give you -- the discovery cutoff is not being extended, but I will give you 14 days beyond the discovery cutoff to get your answers in, assuming — this assumes — you get the 80 by 5 p.m. on Monday.

MS. SESSIONS: Thank you, your Honor.

THE COURT: All right.

I hesitate to do this, but what else? Go ahead.

MS. VASH: Thank you, your Honor.

On behalf of plaintiff Inform, we raised three issues in our June 14th letter to the Court. The one was already addressed by the Court, and we appreciate that.

The other two were as respects the production of a data set that is relevant to plaintiff Inform, and the request following receipt of the majority of the Inform-specific documents, and the understanding that there are really no direct communications, the request to depose a witness who had previously been identified in the MDL group's request for depositions. So those --

THE COURT: Tell me about the witness and why -- one of the things I understand, there's a back and forth. The assertion is that you've known about this person since August 2023. Tell me about the "why now" and "why not sooner" as to this witness.

MS. VASH: Well, as respects this witness, this is the person who introduced our client to Google. And "why now" is because of the documents that were just produced in the last week or two.

THE COURT: Okay.

MS. VASH: And those documents indicate -- I probably shouldn't say too much on the record, but they very much support our theory.

THE COURT: Okay.

MS. VASH: And they are definitely going to be front and center at our trial.

And I believe that your Honor said in one of our first meetings that you think many cases — forgive me if I misstate — come down to ten, ten documents.

THE COURT: That's what I did say.

MS. VASH: Well, I've got two of them here, Judge. And this is the witness.

THE COURT: Okay.

Now, with regard to -- I'm going to give Google an opportunity to respond on this, but let me just ask you about the transaction level data.

They maintain that no transaction level data of the sort are maintained in the ordinary course of their business; that they have repeatedly explained this to Inform; and that they believe that the issue had been put to rest based on its recent meet-and-confer.

You want me to order them? How many transactions do you think your request covers? And give me like a round number estimate. 1,000? 100,000? A million?

MS. VASH: It's more than that, Judge.

THE COURT: More than a million.

MS. VASH: We were looking for a similar slice of --

THE COURT: How much more than a million?

MS. VASH: One week's worth of transactions for our

client alone.

THE COURT: You're seeking one week.

MS. VASH: One week.

THE COURT: Okay. So how much would that be? I mean, roughly. I mean, round numbers.

MS. VASH: I would think several million impressions.

THE COURT: Okay. For just one week.

MS. VASH: Yes, sir.

THE COURT: All right.

Now, Google says — and again, as I prepare to believe if it's true and disbelieve if it's not true. But they say they don't keep such information in the ordinary course of business and this would be an exercise of putting together such data.

MS. VASH: Judge, when we were working with Google, we had an agreement whereby we were paying for that data. So they should have kept it. In connection with my client, they should, in fact, have kept that data in the ordinary course of business. And so it's not really -- it wouldn't be going and reaching out into the ether; it should be something that they've already collected and they already have.

THE COURT: Okay. So you're looking for something they already have. And what week are you looking for?

MS. VASH: I am looking for a week in and around 2014. And I would give your Honor and I would give Google the exact

week following this conference.

THE COURT: All right.

Now let me turn to Ms. Sessions.

MS. SESSIONS: Thank you, your Honor.

I'll take the data first.

This new position that they are somehow looking for some data that Inform previously paid Google to retain or provide is -- I frankly don't understand what it is that they are asking for. So if they want to identify some report or some item of data that they believe that Google previously provided to them that we should have, that's one thing. That is not what they have asked us to provide.

What they have asked us to provide is a completely custom data set that would join up all kinds of data from various transactions akin to what we created at the outset of this case and have provided to all plaintiffs. And that took months and a bespoke programming pipeline to even try to create.

THE COURT: Well, the good news for everybody, I guess, is Ms. Vash says that's not what she's looking for. So Ms. Vash has the opportunity to identify to you what ordinary-course-of-business documents she's talking about. And I'm going to deny the requests for transaction level data without prejudice to Inform doing that. They reserve the right to come back to me if they're successful in showing that --

well, actually, they won't need to. Because if they are successful in showing it and you have it, you're going to produce it.

MS. SESSIONS: Understood, your Honor.

THE COURT: Correct?

MS. SESSIONS: Yes.

THE COURT: Okay.

Now, as to the deposition, it seems to me the request is reasonable. Inform is late to the party. And I understand the point that it could have been done sooner, but I'm going to allow it. And again, it can take place, but no later than the 14-day bulge period. We'll call it the bulge period. I'm not calling it an extension.

MS. SESSIONS: Understood, your Honor.

THE COURT: All right.

MS. VASH: Thank you, Judge.

THE COURT: Now I ask again, anything else?

MR. KOROLOGOS: No, your Honor.

MS. VASH: Nothing further, Judge. Thank you.

MR. STINER: Nothing for advertisers, your Honor.

MR. GOODNOW: Your Honor, I've got two small points for Daily Mail and Gannett, if you don't mind.

THE COURT: Sure.

MR. GOODNOW: The last -- excuse me, a couple of months Daily Mail and Gannett has sent a source code expert to

go review the source code at Axinn's offices here in New York. And we've made a request for a piece of Python program software to be downloaded onto the source code computer. I understand it's something that is free and you just download online. And, in fact, we sent them the link. We've asked three times for it and we haven't gotten a response yet. With fact discovery closing next week and our expert is going to be in New York for the bulk of next week, the 25th to the 28th, we're hoping to get the software on the computer so he can use it to read the source code.

THE COURT: Well, you'll get a response by 5 p.m. tomorrow.

MR. GOODNOW: Thank you, your Honor.

THE COURT: Thank you.

Anything from the defendants?

MS. SESSIONS: Just a flag, your Honor, because I'd be remiss if I didn't mention it while we're in front of you.

We have potentially one or two issues relating to scheduling remaining depositions of the plaintiffs in this case. And there's at least one plaintiff who has indicated that they are unavailable during the fact discovery period and for some time after that. So we may be coming back to your Honor with a limited request to take that deposition beyond your Honor's fact discovery cutoff.

But nothing for your Honor to resolve now.

THE COURT: Placeholder more than anything else.

MS. SESSIONS: Correct.

THE COURT: Okay.

Anything else from anybody?

MR. GOODNOW: Your Honor, I mentioned two points. Then I made the first and got over eager and sat down.

Two months ago Google did agree to produce log level data to Daily Mail.

THE COURT: What?

MR. GOODNOW: Sorry, your Honor. The microphone is away from me.

THE COURT: Produce?

MR. GOODNOW: To produce transaction level data to Daily Mail and Gannett. So we have an agreement to that. My understanding is is that they are going to make the production of data by the end of fact discovery.

We have one outstanding question we've raised to Google, which is whether they're going to define certain of the transaction level fields that have not yet been defined in the case. Google's defined a number of terms, but we think they are making a production of certain others that haven't been defined. So we're hoping just to get an answer from them whether they are willing to define those terms. They've told us they'd be willing to define a reasonable number, but I haven't actually gotten an answer yet on that question.

THE COURT: Talk. Talk to each other.

MR. GOODNOW: We have an outstanding request and I haven't heard back.

THE COURT: Excuse me?

MR. GOODNOW: I said, your Honor, we have an outstanding request and I haven't heard back. I'd be happy to get back in touch with them if that's what you'd like me to do.

THE COURT: Ms. Sessions, you're going to see that a response is given to this request?

MS. SESSIONS: Yes, your Honor.

MR. GOODNOW: Thank you, your Honor.

THE COURT: Well, I hope that I don't see you until after the bulge. And therefore, I take this occasion to wish you all a very happy Independence Day and to congratulate you prematurely on possibly getting to the finish line on fact discovery.

And please do not take this the wrong way. I will be thinking about you, but I hope I don't hear from you except with good news of joy and agreement.

We are adjourned.

* * *